ROTTENBERG LIPMAN RICH, P.C.
Mark M. Rottenberg, Esq.
Park 80 West, Plaza One
Saddle Brook, New Jersey 07663
(201) 490-2022

RECEIVED
JAN - 8 2007
SUPERIOR COURT OF NEW JERSEY
MONMOUTH COUNTY
FINANCE DIVISION

```
---------------------------------------------------------  X
                                                           :
FIRST MONTAUK FINANCIAL CORP.,                             :
                                                           :
                              Plaintiff,                   :
                                                           :
      -against-                                            :
                                                           :
EDWARD H. OKUN, FMFG OWNERSHIP, INC.,                      :
FMFG ACQUISITIONCO, INC., INVESTMENT                       :
PROPERTIES OF AMERICA, LLC AND IPofA                       :
WATER VIEW, LLC,                                           :
                                                           :
                              Defendants.                  :
---------------------------------------------------------  X
```

SUPERIOR COURT OF NEW JERSEY
CHANCERY DIVISION:
MONMOUTH COUNTY
DOCKET NO. ___ -C-

CIVIL ACTION

COMPLAINT

Jury Trial Demanded

Plaintiff, First Montauk Financial Corp. ("Plaintiff" or "First Montauk"), by and through its counsel, Rottenberg Lipman Rich, P.C., as and for its Complaint against defendants, Edward H. Okun ("Mr. Okun"), FMFG Ownership, Inc. ("Ownership"), FMFG AcquisitionCo, Inc. ("Acquisition" and, together with Ownership, collectively "Buyer"), Investment Properties of America, LLC ("IPofA") and IPofA Water View, LLC ("Water View" and, together with Buyer, IPofA and Okun, collectively the "Okun Defendants"), alleges as follows:

Introduction

1.     By this action, First Montauk seeks, among other things, specific performance of a certain Agreement and Plan of Merger dated as of May 5, 2006, by and among Buyer and First Montauk (the "Merger Agreement"), pursuant to which Acquisition was to acquire and merge into First Montauk.

2.      Buyer purportedly terminated the Merger Agreement by letter dated December 29, 2006 (the "Termination Letter") falsely claiming that First Montauk failed to obtain regulatory approval for the merger in a timely manner and materially breached one or more of its representations, warranties, covenants or agreements in the Merger Agreement.

3.      Buyer's purported bases for termination of the Merger Agreement are transparently disingenuous as the Okun Defendants are solely responsible for having delayed approval of the merger by the National Association of Securities Dealers, Inc. ("NASD"), which is necessary since First Montauk's primary business is conducted through its wholly-owned subsidiary, First Montauk Securities Corp. ("FMSC"), a securities broker/dealer registered with the Securities and Exchange Commission (the "SEC") and the NASD.  NASD Rule 1017 (a) (4) requires a NASD member such as FMSC to file an application for approval of a change in the equity ownership or partnership capital of a member that results in one person or entity directly or indirectly owning or controlling 25 percent or more of the equity or partnership capital of a member.  Since Acquisition proposed to acquire in excess of 25 percent of First Montauk's equity ownership, NASD approval under Rule 1017 was required as a condition to the merger.

4.      The Okun Defendants, however, have refused to disclose financial information requested by the NASD related to Ownership's sole shareholder, Mr. Okun, and IPofA, another entity controlled by him.  Indeed, at Mr. Okun's request, the NASD granted an extension until January 5, 2007 for IPofA and Mr. Okun to furnish the requested information.

5.      As to material breach, the Termination Letter fails to describe any breach of a specific representation, warranty or covenant in the Merger Agreement by First Montauk and, to the extent that the Okun Defendants do so in response to this lawsuit, any and all such alleged breaches are immaterial or otherwise fail to justify Buyer's termination of the Merger Agreement.

- 2 -

6.      In short, Buyer has no justification to terminate the Merger Agreement, which is valid and enforceable.  Specific performance is the preferable remedy because it is the only result that will redress adequately the harm suffered by and threatened to First Montauk and its shareholders (other than Ownership), who voted to approve the merger and the Merger Agreement on August 17, 2006.

7.      Upon information and belief, as more fully alleged below, contrary to the Okun Defendants' representations to First Montauk, Buyer terminated the Merger Agreement solely because Mr. Okun and the Okun Defendants were unable to obtain financing on terms acceptable to Mr. Okun to fund the Buyer's payment obligation under the Merger Agreement of approximately $23 million.  The Okun Defendants, therefore, refused to comply with the NASD's request for evidence of the source of funds used by Mr. Okun to purchase First Montauk securities, and to be used by Mr. Okun in the acquisition of First Montauk, including complete bank statements, a copy of any proposed loan documents, and/or audited financial statements of any entity from which funds would be obtained, and evidence of the authorization of IPofA for the funds already used, and to be used, by Mr. Okun in the acquisition of First Montauk.  See paragraph 45 below.

8.      Pending adjudication of First Montauk's claims, First Montauk seeks an injunction enjoining the Okun Defendants, directly, indirectly, or through third parties, without the prior written consent of First Montauk or an order of this Court, from: (i) selling or otherwise disposing of any First Montauk securities that they currently beneficially own; (ii) purchasing or otherwise acquiring any additional First Montauk securities; and (iii) converting shares of First Montauk Series A preferred stock into shares of First Montauk common stock.

9.     Such interim relief is necessary and appropriate to preserve the <u>status quo</u> during the pendency of this action, so that First Montauk's request for specific performance of the Merger Agreement will not be rendered moot or impossible by the Okun Defendants during the pendency of this action.

10.     For the same reason, First Montauk also seeks an injunction requiring the Okun Defendants, including, in particular, Mr. Okun and IPofA, to comply with the NASD's request to provide the financial information requested of them by the NASD in connection with FMSC's application to the NASD approving a change of control of FMSC.

11.     Absent the temporary injunctive relief requested herein, First Montauk's claim for specific performance may be rendered moot, as once Ownership disposes of its First Montauk's securities, it may not be possible to consummate the merger.  Similarly, the Okun Defendants should be prohibited during the pendency of this action without First Montauk's prior written consent or an order of this Court from acquiring additional securities of First Montauk that could enable them to launch a takeover of First Montauk outside of the Merger Agreement since the price of First Montauk securities plummeted precipitously before the public announcements regarding the delay and subsequent termination of the Merger Agreement making it perhaps less costly for Mr. Okun to launch a takeover by purchasing shares in the public market rather than proceeding with the merger as contractually obligated under the Merger Agreement.

12.     Prior to the public announcements regarding the possible termination of the Merger Agreement by Buyer, First Montauk's common stock was trading in the range of $.80 to $.95 per share, and prior to the public announcements regarding the delay and subsequent termination by Buyer of the Merger Agreement, the market price of First Montauk's common stock plunged precipitously to a range of $.41 to $.48 per share.

13.    Alternatively, and in the event that the NASD refuses to grant regulatory approval of the merger by reason of the Okun Defendants' refusal to provide requested financial information to the NASD, First Montauk seeks to recover damages from the Okun Defendants for the losses and expenses that it has suffered and will continue to suffer by reason of material breaches of the Merger Agreement by FMFG (although First Montauk believes, and Buyer has conceded in Section 10.07 of the Merger Agreement, that money damages are insufficient and inadequate to remedy the irreparable harm that First Montauk and its shareholders (other than Ownership) have suffered and will continue to suffer).  See paragraph 86 below.

14.    Alternatively, and in the event that the NASD refuses to grant regulatory approval of the merger by reason of the Okun Defendants' refusal to provide requested financial information to the NASD, First Montauk also seeks a declaration that First Montauk is entitled to payment of a $2,000,000 deposit that is being held in escrow by Signature Bank, a New York State chartered bank, as escrow agent (the "Escrow Agent"), in accordance with the terms of a certain Escrow Deposit Agreement dated May 5, 2006 (the "Escrow Agreement") by and among Signature Bank, First Montauk and Ownership in connection with the Merger Agreement.

15.    In the event that the Court does not order specific performance of the Merger Agreement, moreover, First Montauk also seeks a declaratory judgment to rescind a lease agreement dated September 22, 2006 (the "Lease") with Water View, an affiliate of Mr. Okun, as landlord, for the premises commonly known as 10 Highway 35, Middletown, New Jersey (the "Premises"), on the ground that the Okun Defendants fraudulently induced First Montauk to execute the Lease, as tenant, falsely representing that Buyer would proceed to consummate the Merger Agreement and if the merger did not close, First Montauk would not be required to occupy

the Premises or pay any rent to Water View under the Lease or be otherwise obligated under the Lease.

16.     Mr. Okun, on behalf of the Okun Defendants, fraudulently induced First Montauk to execute the Lease refusing to include a provision making it conditional upon the consummation of the Merger Agreement by assuring First Montauk that it was not necessary as the merger would close and further assuring First Montauk that if it failed to close for any reason, First Montauk would not be required to build out or occupy the Premises or be otherwise obligated under the Lease.

17.     Upon information and belief, Mr. Okun refused to include such a provision to facilitate the financing of the Premises, which he represented were to be purchased by an affiliate of IPofA and pledged as collateral for a loan.

18.     Alternatively, First Montauk also alleges claims against Buyer for breach of contract and breach of the implied covenant of good faith and fair dealing in connection with its bad faith termination of the Merger Agreement and refusal to proceed with the merger contemplated thereby.

<u>The Parties</u>

19.     Plaintiff, First Montauk, is a New Jersey corporation with its principal place of business at Parkway 109 Office Center, 328 Newman Springs Road, Red Bank, New Jersey 07701.  First Montauk is a public company listed on the NASD Over-the-Counter Bulletin Board under the trading symbol "FMFK.OB."  It is a leading financial services company providing a full spectrum of investment products through independent financial professionals nationwide.

20.     First Montauk conducts its primary business through its wholly-owned subsidiary, FMSC, a securities broker/dealer registered with the SEC and the NASD.  FMSC is

also headquartered at Parkway 109 Office Center, 328 Newman Springs Road, Red Bank, New Jersey 07701.

21.     Defendant Ownership is a Delaware corporation with its principal place of business at 10800 Midlothian Turnpike, Suite 309, Richmond, Virginia 23235.  Upon information and belief, all of the capital stock of Ownership is owned by Mr. Okun, who is the principal shareholder, President and Chief Executive Officer of Defendant IPofA, a developer and syndicator of commercial real estate.

22.     Defendant Acquisition is a New Jersey corporation with its principal place of business at 10800 Midlothian Turnpike, Suite 309, Richmond, Virginia 23235.  Upon information and belief, Acquisition is a wholly-owned subsidiary of Ownership and purportedly was formed for the purpose of merging with First Montauk.

23.     Currently, Ownership is the record owner and Mr. Okun is the beneficial owner of 4,539,348 shares of common stock of First Montauk, or approximately 24.6 percent of its issued and outstanding shares, as well as 283,087 shares of non-voting convertible Series A Preferred Stock.

24.     Defendant Mr. Okun is an individual who, upon information and belief, resides in Miami Beach, Florida and is the sole shareholder of Ownership; the principal shareholder, President and Chief Executive Officer of IPofA and the managing member of Water View.

25.     Defendant IPofA is, upon information and belief, a Delaware limited liability company with its principal place of business at 10800 Midlothian Turnpike, Suite 309, Richmond, Virginia 23235.

26.     Defendant Water View is, upon information and belief, a Delaware limited liability company, with its principal place of business c/o IPofA, 10800 Midlothian Turnpike, Suite 309, Richmond, Virginia 23235.

FACTS

The Merger Agreement

27.     In February 2006, Kenneth Bolton, a registered representative of First Montauk, met with Mr. Okun.  Mr. Bolton had been introduced to Mr. Okun through contacts that he had developed in the real estate marketplace.  Mr. Okun expressed an interest in acquiring a broker-dealer, and inquired about the possibility of purchasing First Montauk.

28.     On February 16, 2006, Victor K. Kurylak ("Mr. Kurylak"), First Montauk's President and Chief Executive Officer, met with Mr. Okun, who expressed an interest in purchasing First Montauk.  Subsequent discussions followed and, on February 21, 2006, First Montauk and Mr. Okun executed a confidentiality agreement, pursuant to which First Montauk provided Mr. Okun with certain financial and other confidential information concerning First Montauk.

29.     On February 24, 2006, at a meeting of First Montauk's Board of Directors (the "First Montauk Board"), Mr. Kurylak reported that Mr. Okun had expressed an interest in acquiring First Montauk in an all-cash transaction.  He further stated that Mr. Okun's formal proposal would be made only after the completion of due diligence and consultation with his financial and legal advisors.

30.     The First Montauk Board then formed a special committee of independent directors (the "Special Committee") to evaluate Mr. Okun's proposal and those of any other

prospective purchasers, and to make recommendations to the First Montauk's Board and its shareholders.

31.     At its first meeting on February 24, 2006, the Special Committee elected David Portman to be its chairman and authorized the retention of Capitalink, L.L.C. ("Capitalink") as its financial advisor.  The Special Committee empowered Mr. Kurylak to continue discussions with Mr. Okun related to the acquisition proposal and directed him to report back to the Special Committee periodically.

32.     On March 9, 2006, First Montauk received a proposed letter of intent pursuant to which Mr. Okun, through a newly-formed affiliated company, offered to acquire all of the outstanding shares of First Montauk for cash.  During the next few days, representatives and legal counsel for First Montauk and Mr. Okun negotiated the letter of intent.

33.     On March 11, 2006, First Montauk and Mr. Okun signed a non-binding letter of intent for the purchase of all of the outstanding shares of First Montauk by an affiliate of Mr. Okun.

34.     On March 13, 2006, the companies issued a joint public press release announcing the signing of the non-binding letter of intent.  First Montauk also filed a Form 8-K with the SEC disclosing the letter of intent and included a copy of the press release as an exhibit thereto.

35.     Following the execution of the letter of intent and during the next several weeks, legal counsel for First Montauk and for Mr. Okun exchanged drafts of a Merger Agreement.  The Special Committee met on several occasions to receive reports from counsel and to discuss various aspects of the acquisition proposal and the status of the negotiations of a definitive acquisition agreement.

36.     During this time, representatives of Mr. Okun engaged in extensive due diligence of First Montauk, including on-site due diligence at First Montauk's corporate headquarters. The due diligence team included representatives of Mr. Okun's legal team from the Omaha, Nebraska law firm of Kutak Rock LLP and financial, legal and managerial personnel from IPofA.

37.     On April 6 and 7, 2006, the Special Committee met via telephone conference to discuss the proposed merger and receive reports from its financial and legal advisors. After due deliberation, the Special Committee unanimously resolved to recommend to the First Montauk Board the approval of the Merger Agreement and the merger between First Montauk and Mr. Okun's affiliate, subject to final negotiation of any remaining issues by legal counsel.

38.     On April 20, 2006, the First Montauk Board met to receive the report of the Special Committee with respect to the proposed merger of First Montauk with an affiliate of Mr. Okun. After extensive discussion and deliberation on the proposed transaction, the First Montauk Board unanimously determined that the Merger Agreement and the merger were in the best interests of First Montauk and its shareholders. The First Montauk Board further resolved to approve the merger, execute the Merger Agreement, recommend that the shareholders of First Montauk approve the Merger Agreement and the transactions with Mr. Okun's affiliate, and to submit the Merger Agreement to a vote at a special meeting of First Montauk's shareholders.

39.     On May 5, 2006, First Montauk and Buyer executed, among other documents, the Merger Agreement as well as the Escrow Agreement.

40.     Under the terms of the Merger Agreement, Buyer would pay $1.00 in cash for each common share of First Montauk, $2.00 in cash for each Series A preferred share of First

Montauk (based on the conversion of each Series A share into two shares of common stock), and $10.00 in cash for each Series B preferred share of First Montauk (based on the conversion of each Series B share into ten shares of common stock). Given the number of outstanding shares of First Montauk securities (including convertible securities), the Merger Agreement obligated the Buyer to pay approximately $23 million in consideration for acquisition of outstanding First Montauk securities, and make an additional $ 3 million capital contribution to First Montauk.

41. Under the terms of the Merger Agreement and Escrow Agreement, so long as no default existed under the terms of the Merger Agreement on the closing date, the Escrow Agent was obligated to transfer to First Montauk's bank the $2,000,000 deposit to be used in part to pay holders of First Montauk stock their appropriate cash merger consideration. In the event that the merger did not close on or before the agreed expiration date through no fault of First Montauk, or did not close because Buyer had materially breached any of its representations, warranties, covenants or agreements, which breach had not been cured or was incapable of being cured, First Montauk would be entitled to receive the $2,000,000 from the Escrow Agent.

42. Upon execution of the Merger Agreement and Escrow Agreement, Ownership deposited $2,000,000 with Signature Bank, as Escrow Agent, pursuant to the terms of the Merger Agreement and Escrow Agreement.

43. On May 8, 2006, the parties issued a joint press release announcing that they had signed the Merger Agreement. On May 9, 2006, First Montauk filed a Form 8-K with the SEC announcing the Merger Agreement and the proposed merger.

44. Subsequent to the execution of the Merger Agreement, representatives of Mr. Okun continued to perform their due diligence review of First Montauk.

<u>First Montauk Shareholders Approve the Merger Agreement</u>

45.     Following execution of the Merger Agreement, Ownership purchased in June, 2006—both in the open market and privately, 2,159,348 shares of First Montauk common stock; purchased privately 283,087 shares of First Montauk Series A preferred stock at a price of $4.00 per share convertible into 566,174 shares of First Montauk common stock; and purchased $1,190,000 of First Montauk convertible debentures, convertible into 2,380,000 shares of First Montauk common stock.  On June 21, 2006, Ownership converted all their convertible debentures into 2,380,000 shares of First Montauk common stock.

46.     As a result of such purchases, as of June 26, 2006, the record date for the special meeting of First Montauk's shareholders to consider and vote on the merger, Ownership and/or Mr. Okun beneficially owned approximately 24.6 percent of First Montauk common stock (slightly less than 25 percent that would trigger NASD approval under NASD Rule 1017), assuming no shares of Series A preferred stock are converted into common stock.

47.     Ownership also owns 92.7 percent of the outstanding shares of Series A preferred stock. The holders of Series A preferred stock have no voting rights, but in connection with the merger under the New Jersey Business Corporation Act, such holders are entitled to a separate class vote.  As a result of such purchases of Series A preferred stock, Mr. Okun and his affiliates owned a sufficient number of shares of Series A preferred stock to vote such shares separately as a class to approve the merger.

48.     On or about July 18, 2006, Mr. Okun and Ownership expressed their intention, as stated in First Montauk's proxy statement to shareholders, to vote at the Special Meeting all their shares of common stock and First Montauk Series A preferred stock as of the record date in favor of the Merger Agreement and the merger.  Pursuant to the Merger Agreement,

shares of First Montauk common stock and Series A preferred stock owned by Ownership at the effective time of the merger would be cancelled in the merger and would not receive payment of any cash merger consideration.

49.     On August 17, 2006, at a special meeting of shareholders of First Montauk, shareholders (including Ownership) representing 98.2% of the shares voting at the meeting approved the Merger Agreement and the merger.

<u>The Parties Seek NASD Approval of a Change in Ownership of FMSC</u>

50.     Pursuant to the Merger Agreement, the parties agreed to prepare and file all filings required under the Securities Exchange Act of 1934, as amended, including an application pursuant to NASD Rule 1017 ("Rule 1017 Application") for approval of the change of ownership of FMSC by reason of the merger and the transfer of beneficial ownership of in excess of 25 percent of the capital stock of FMSC.  The Merger Agreement provides that each party specifically agrees to obtain and furnish to the NASD information required to be submitted in connection with the Rule 1017 Application.  The Merger Agreement also contains a further provision requiring each of the parties to use their reasonable best efforts to take, or cause to be taken, all actions and to do, or to cause to be done, all things necessary or desirable to consummate the merger contemplated by the Merger Agreement.

51.     Accordingly, on August 11, 2006, FMSC submitted to the NASD a Rule 1017 Application for change in ownership of FMSC together with certain documentation.

52.     Pursuant to the NASD Rules, First Montauk and Buyer, and their affiliates (including Mr. Okun and IPofA), were required to submit extensive information to the NASD to obtain its approval to effect a change in the ownership of FMSC.

53.     By letter dated September 12, 2006, the NASD requested additional information from both First Montauk as well as from Mr. Okun, IPofA and their affiliates in connection with the Rule 1017 Application concerning the proposed acquisition. Accordingly, on October 12, 2006, First Montauk made an additional submission to the NASD responding to the NASD's inquiries and providing additional documentary evidence.

54.     In connection with FMSC's Rule 1017 Application, a "New Member Interview" took place at the New Jersey District Office of the NASD on November 2, 2006, attended by representatives of the NASD, First Montauk, Buyer, Mr. Okun and Dan Applewhite, Esq., an in-house attorney at IPofA ("Mr. Applewhite"), to discuss the proposed acquisition. During that meeting, NASD officials specifically requested that Mr. Okun provide unredacted documents (including bank statements) confirming the source of funds used to acquire shares of First Montauk already purchased and shares to be acquired in the merger. Mr. Okun, as the ultimate controlling person of Ownership, pledged to NASD officials that information requested by the NASD concerning the source of funds for the acquisition would be readily available, forthcoming and delivered on a timely basis to the NASD. In addition, Mr. Okun acknowledged before the NASD that he anticipated and was prepared to invest more than $3 million in capital required by the Merger Agreement.

55.     Following this meeting, on November 15, 2006, the NASD sent a second request for additional documentation relating to the proposed merger. In its letter, the NASD requested seven specific items of information, four of which pertained to First Montauk and three of which pertained to Mr. Okun, IPofA and/or their affiliated entities. Specifically, the NASD requested with respect to Mr. Okun, IPofA and/or their affiliated entities: (i) evidence of the source of funds used and to be used by Mr. Okun in the acquisition of First Montauk, including

complete bank statements, a copy of any proposed loan documents, Mr. Okun's personal income tax return for 2005 and/or audited financial statement of any entity from which funds would be obtained; (ii) if applicable, evidence of the authorization of IPofA for the funds already used, and to be used, by Mr. Okun in the acquisition of First Montauk; and (iii) certain pleadings and settlement documents in connection a previous civil suit involving Mr. Okun and certain of his affiliated entities and other parties.  The NASD stated that this response for information was due on or before December 15, 2006.

56.     During the period from November 15, 2006 to December 8, 2006, First Montauk and its legal counsel diligently worked to prepare a response to the first four items in the NASD's second information request, which pertained to First Montauk.  During this period, representatives of First Montauk updated Mr. Okun, IPofA and their affiliates concerning the information requested by the NASD as well as First Montauk's overall business plan including financial projections.  For example, on November 20 and 21, 2006, senior members of First Montauk management met at the New Jersey corporate offices of First Montauk with David Field, Chief Financial Officer of IPofA ("Mr. Field"), and Mr. Applewhite to review First Montauk's operating plan requested by the NASD as well as First Montauk's preliminary business plan and summary financial projections and capital requirements for the period from 2007-2011 as had been requested by Mr. Okun and his representatives, separate and apart from the NASD's request. Messrs. Field and Applewhite were provided with copies of the preliminary business plan and summary financial projections and capital requirements. In addition, during this period, First Montauk attempted on several occasions to get Mr. Okun and his representatives, Mr. Field and Mr. Applewhite, to furnish the information concerning Mr. Okun and his affiliates requested by the NASD. Mr. Kurylak specifically discussed this matter with Mr. Field and he advised Mr.

Kurylak that Mr. Applewhite would be "pulling together" the information for submission to the NASD.

57.     On or before December 8, 2006, Mr. Okun, IPofA and their affiliates replaced their counsel on the merger (Kutak Rock LLP) with Kluger Peretz Kaplan & Berlin of Miami, Florida ("Kluger Peretz"), and retained Randall Kominsky ("Mr. Kominsky"), an independent consultant, to perform additional due diligence on their behalf in connection with the merger. On December 11, 2006, Mr. Kominsky appeared at the corporate offices of First Montauk to conduct a "final walk through" to enable Mr. Okun to understand the full value of First Montauk. First Montauk was also advised by Mr. Applewhite that Kluger Peretz would now be responsible for providing to the NASD the information requested of Mr. Okun and his affiliates by the NASD.

58.     On December 11, 2006, representatives of First Montauk spoke via conference call with new Buyer counsel, Kluger Peretz. The stated purpose of the conference call, in addition to introducing Mr. Okun's new counsel, was to clarify what work on behalf of Mr. Okun would be performed by Mr. Kominsky, notwithstanding that the shareholders of First Montauk, including Mr. Okun's affiliate, Ownership, had already voted to approve the Merger Agreement and the merger. The purpose of the call was also to determine the status of the information request by the NASD to be provided by Mr. Okun and his affiliates.  During the conference call, First Montauk and counsel to First Montauk received an unexpected faxed letter from Dale S. Bergman, Esq. of Kluger Peretz (who was also on the conference call) notifying First Montauk and its outside legal counsel of Kluger Peretz's retention and alleging, for the first time, that "it appears that [First Montauk] has failed to fully comply with the various pre-closing covenants required on its part under the Merger Agreement" allegedly relating to the failure to

furnish updated due diligence information, the hiring of new key executives (including the terms of their retention) and, vaguely, a "material adverse change" in First Montauk's financial condition.  The December 11, 2006 letter from Kluger Peretz further advised that Mr. Kominsky would be arriving at First Montauk's New Jersey corporate offices on that date to conduct additional due diligence and would remain there until he completed his work.

59.     During the conference call with Kluger Peretz, Mr. Kurylak vigorously denied all of the allegations in Mr. Bergman's letter and asserted that Mr. Okun's new representatives were wrong about the facts underlying the allegations in the December 11, 2006 letter.  Mr. Kurylak further stated that, with respect to the allegation that First Montauk had not furnished Mr. Okun and his affiliates with details regarding key executives hired and the terms and scope of their retention, he assumed that Mr. Bergman was referring to the hiring of Philip D'Ambrisi as Chief Operating Officer and Celeste Leonard as Chief Compliance Officer of FMSC.  Mr. Kurylak responded that, not only was Mr. Okun continually informed of the status of the discussions with respect to their recruitment and hiring, but that Mr. D'Ambrisi had personally met with Mr. Okun prior to being hired.  Mr. Okun personally approved the terms of Mr. D'Ambrisi's employment.  Ms. Leonard also conferred by telephone with Mr. Okun regarding her employment with FMSC and Mr. Okun personally approved the terms of her employment.  In addition, IPofA's representatives were provided with copies of the employment term sheets and employment agreements of Mr. D'Ambrisi and Ms. Leonard, respectively, prior to their joining First Montauk.

60.     Mr. Kurylak also disputed the claim that First Montauk had failed to develop and submit a business plan to Mr. Okun and his representatives.  Mr. Kurylak explained that there was a difference between the operating plan requested by the NASD in connection with

the Rule 1017 Application (which had also been submitted to Mr. Okun and his representatives) and the business plan with summary financial projections requested by Mr. Okun.  Mr. Kurylak stated that he and First Montauk management had prepared a preliminary business plan and summary financial projections despite the fact that they had been focusing the majority of their efforts on the NASD requested operating plan.  He reviewed the business plan and summary financial projections with Mr. Field and Mr. Applewhite in detail at their November 20-21, 2006 meeting, and with other representatives of Mr. Okun.  Mr. Kurylak also noted that the preliminary business plan and summary financial projections, unlike the operating plan, did not have to be submitted to the NASD.

61.     During the conference call, Mr. Kurylak requested that Mr. Applewhite confirm Mr. Okun's and IPofA's participation in the hiring of these employees, and all of Mr. Kurylak's other statements in response to the claims in the letter. Mr. Applewhite affirmatively confirmed Mr. Kurylak's statements during the conference call.

62.     During the December 11, 2006 conference call, Mr. Kurylak and representatives of First Montauk also questioned Kluger Peretz with respect to whether Mr. Okun and his affiliates intended to comply with the NASD's November 15, 2006 request for additional financial information and whether Mr. Okun and his affiliates intended to go forward to complete the merger, which had already been approved by shareholders of First Montauk, including Mr. Okun and his affiliate, Ownership, on August 17, 2006, on the terms and conditions stated in the Merger Agreement.

63.     During the December 11, 2006 conference call, Kluger Peretz requested that First Montauk submit a request to the NASD for a 45-day extension for Mr. Okun and his affiliates to comply with the NASD's information request.  Kluger Peretz refused, however, to

give assurance that Mr. Okun and his affiliated entities would comply with the information request by the NASD, or that Mr. Okun and his affiliates intended to go forward to complete the merger. During the conference call, the participants also discussed a further extension of the December 31, 2006 termination date provided for in the Merger Agreement, as amended, as the date by which the merger must be consummated.

64.     On December 14, 2006, counsel for First Montauk sent a letter to Mr. Bergman responding to his December 11, 2006 letter, as well as other issues that arose during a series of conference calls since that time.  The December 14, 2006 letter stated that First Montauk had made all material executive decisions with the active participation and consent of Mr. Okun personally and IPofA, and that Mr. Okun and his affiliates and representatives had been granted nearly unlimited access to First Montauk's books, records and personnel since discussions of the Merger Agreement began nine months earlier; nearly all of the information now being requested by Mr. Okun and IPofA's new representative, Mr. Kominsky, had been previously furnished to IPofA at least once, if not twice; and that not only were material expenditures approved by IPofA, but that Mr. Okun has personally appeared before the NASD in November 2006 and had assured the NASD that he intended to invest all capital necessary to build and maintain FMSC, and that Mr. Okun anticipated and was prepared to invest more than the $3 million of capital required by the Merger Agreement.  The December 14, 2006 letter also confirmed that First Montauk would request the NASD for a 45-day extension of time to respond to the NASD's request for additional information, but that no assurances could be given that the NASD would approve such a request. Finally, the December 14, 2006 letter enclosed a draft of an amendment to the Merger Agreement extending the termination date of the Merger Agreement from December 31, 2006 to March 31, 2007, as previously disclosed.

65.     During the week of December 11 through 15, 2006, representatives of First Montauk had several discussions with the NASD concerning an extension of time for Mr. Okun and his affiliates to file the information requested by the NASD.

66.     On December 15, 2006, First Montauk responded fully to the NASD's November 15, 2006 request for additional information, to the extent such request pertained to First Montauk.  Because Mr. Okun, IPofA and their affiliates had refused to supply the additional information pertaining to them, First Montauk was constrained to ask the NASD for an additional extension of time until January 31, 2007 within which to supply the information that the NASD had requested from Mr. Okun, IPofA and their affiliates. Subsequently, on December 20, 2006, the NASD granted such extension to January 5, 2007.

Buyer Wrongfully Refuses to Proceed with the Merger

67.     In a conference call on December 19, 2006 between counsel for First Montauk and Kluger Peretz, the latter announced that Mr. Okun and his affiliates were unwilling to go forward with the merger upon the terms and conditions set forth in the Merger Agreement and that Mr. Okun and his affiliates would not be providing additional information to the NASD as requested.

68.     Following the conference call, counsel for First Montauk sent Kluger Peretz a letter requesting confirmation of some points discussed during the conference call, specifically: (i) IPofA's request that a 45-day period commencing January 1, 2007, to conduct additional due diligence of First Montauk to be performed by Mr. Kominsky; (ii) the right to make a new or "counter" proposal for the acquisition of First Montauk depending upon the results of such due diligence; (iii) Mr. Okun is not willing to complete the acquisition as currently contemplated by

the Merger Agreement; and (iv) Mr. Okun will not be providing information to the NASD prior to the completion of the due diligence period.

69.     On December 20, 2006, the NASD informed First Montauk that, in response to the request for a 45-day extension for Mr. Okun and his affiliates to submit the information requested in the November 15, 2006 letter, the NASD was willing to extend the deadline for 21 days until January 5, 2007 and, in the event that the requested information was not furnished by this extended date, it would consider the Rule 1017Application to have lapsed.  Later that day, counsel for First Montauk informed Kluger Peretz that the NASD had granted an extension of time within which Mr. Okun and his affiliates may submit information to the NASD only until January 5, 2007.

70.     On December 20, 2006, counsel for First Montauk and Kluger Peretz continued discussions on whether Mr. Okun and his affiliated entities would comply with the NASD's request for additional information and whether Mr. Okun's affiliated entities would proceed with the merger upon the terms set forth in the Merger Agreement.  During these conference calls, Kluger Peretz, on behalf of Mr. Okun, informed counsel for First Montauk that Mr. Okun, IPofA and their affiliated entities would not complete the proposed acquisition of First Montauk according to the terms of the Merger Agreement.

71.     On December 21, 2006, First Montauk filed with the SEC a Form 8-K disclosing, among other things, that IPofA had informed First Montauk that IPofA would not complete the merger in accordance with the terms of the Merger Agreement, which filing was later amended to clarify that the parties to the Merger Agreement were affiliates of IPofA, not IPofA itself.

72.     On December 27, 2006, Kluger Peretz sent counsel for First Montauk a letter claiming that some of the information requested by the NASD in its November 15, 2006 letter was previously submitted and providing additional information purporting to contain some of the information requested by the NASD.

73.     After reviewing the letter and documents sent by Kluger Peretz, counsel for First Montauk sent a letter to Kluger Peretz dated on December 27, 2006 stating that the materials sent for submission to the NASD were inadequate and did not satisfy the NASD's request for information in connection with the Rule 1017 Application, and notifying Kluger Peretz that the failure by Mr. Okun, IPofA and their affiliated entities to provide the information requested by the NASD by the extended January 5, 2007 deadline jeopardized approval by the NASD of the proposed merger and heightened the possibility of denial of the Rule 1017 Application by the NASD, which could have a materially adverse effect on the continuing business operations of First Montauk and its principal subsidiary, FMSC.

74.     By letter dated December 29, 2006, Buyer notified First Montauk that it was terminating the Merger Agreement purportedly due to:  (a) the NASD having not yet approved the change of ownership application required under the terms of the Merger Agreement (notwithstanding that the NASD had already granted an extension to file such information to January 5, 2007); and (b) First Montauk's material breach of one of more of its representations, warranties, covenants or agreements, without any elaboration other than setting forth a number of sections of the Merger Agreement that First Montauk allegedly breached.  Defendants further demanded that First Montauk agree to the immediate return to Defendants of the monies deposited with the Escrow Agent.

75.    On December 29, 2006, First Montauk issued a press release announcing that it had received notification from representatives of Buyer terminating the Merger Agreement and denying that such termination is appropriate and that First Montauk had materially breached any provisions of the Merger Agreement. First Montauk also filed with the SEC a Form 8-K attaching the foregoing press release as an exhibit.

76.    Upon information and belief, contrary to the Okun Defendants' representations to First Montauk set forth above, Buyer terminated the Merger Agreement because Mr. Okun and the Okun Defendants were unable to obtain financing on terms acceptable to Mr. Okun to fund the Buyer's payment of financial obligations under the Merger Agreement of approximately $23 million in consideration for acquisition of outstanding First Montauk securities, and make an additional $3 million capital contribution to First Montauk. The Okun Defendants, therefore, refused to comply with the NASD's request for evidence of the source of funds used and to be used by Mr. Okun in the acquisition of First Montauk securities, including complete bank statements, a copy of any proposed loan documents, and/or audited financial statements of any entity from which funds would be obtained; and evidence of the authorization of IPofA for the funds already used, and to be used, by Mr. Okun in the acquisition of First Montauk.

The Lease

77.    On September 22, 2006, First Montauk entered into the Lease with Water View for the Premises in good faith reliance on Mr. Okun's representations that the Buyer would consummate the merger.  He assured First Montauk that if the merger failed to close for any reason, First Montauk would not have to occupy the Premises or pay any rent under the Lease. First Montauk currently has a lease for its corporate headquarters which provides suitable office

space and does not expire until January 2010. First Montauk entered into the Lease only through the inducement of Mr. Okun and to accommodate his business needs.

78.     Mr. Okun refused to include, however, a provision in the Lease making the Lease contingent upon the closing of the merger.

79.     Upon information and belief, Mr. Okun refused to include such a provision because it would inhibit his ability to finance the purchase of the Premises, which were to be purchased by an affiliate of IPofA.

80.     First Montauk would not have executed the Lease but for its reasonable reliance on the truth of the representations made by Mr. Okun, then individually and through Ownership, a major shareholder of First Montauk, that Buyer would proceed to consummate the Merger Agreement and that if the merger did not close for any reason, First Montauk would not be required to occupy the Premises, pay any rent to Water View under the Lease or otherwise be obligated under the Lease.

<u>First Cause of Action</u>
<u>(Against Buyer for Specific Performance)</u>

81.     First Montauk repeats and realleges paragraphs 1 through 80 of this complaint as if fully set forth herein.

82.     The Merger Agreement is a valid and enforceable contract.

83.     First Montauk has substantially performed under the Merger Agreement and is willing and able to perform its remaining obligations, except, in both respects, to the extent Buyer has rendered First Montauk's performance impossible.

84.     Upon information and belief, Buyer is able to perform its obligations under the Merger Agreement.

85.     First Montauk has no adequate remedy at law for Buyer's repudiation and material breach of the Merger Agreement and specific performance is the only remedy by which the harm to First Montauk and its shareholders (other than Ownership) may be fully redressed.

86.     Indeed, in Section 10.07 of the Merger Agreement, the parties expressly agreed:

> that money damages or other remedies at law would not be a sufficient or adequate remedy for any breach or violation of, or a default under, this Agreement by them and that in addition to all other remedies available to them, each of them shall be entitled to the fullest extent permitted by law to an injunction restraining such breach, violation or default or threatened breach, violation or default and to any other equitable relief, including, without limitation, specific performance, without bond or other security being required.

87.     First Montauk has suffered and will continue to suffer irreparable harm in that the uncertainty created by the purported termination of the Merger Agreement is wreaking havoc with management and employee morale, as rumors are circulating in the financial community that FMSC is going out of business.  As a result, headhunters are soliciting FMSC personnel to leave FMSC's employ and other broker-dealers and their registered representatives are soliciting FMSC's customers attempting to woo them away from FMSC.

WHEREFORE, First Montauk respectfully demands judgment against Buyer, jointly and severally, directing them specifically to perform their duties and obligations under the Merger Agreement and otherwise effectuate the closing thereof upon the terms set forth in the Merger Agreement; awarding to First Montauk its cost and disbursements, including attorneys' fees, and such other and further relief as the Court deems just and proper.

Second Cause of Action
(Against each of the Okun Defendants for an Injunction)

88.     First Montauk repeats and realleges paragraphs 1 through 87 of this complaint as if fully set forth herein.

89.     Pending determination of First Montauk's claims, First Montauk seeks an injunction enjoining Mr. Okun and Ownership, directly, indirectly or through third parties, without the prior written consent of First Montauk or an order of this Court, from selling or otherwise disposing of any First Montauk securities that he and/or Ownership currently beneficially own, from purchasing or otherwise acquiring any additional First Montauk securities and from converting shares of First Montauk Series A Preferred Stock into shares of First Montauk Common Stock in order to preserve the status quo during the pendency of this action, so that First Montauk's request for specific performance of the Merger Agreement will not be rendered moot or impossible  by the Okun Defendants during the pendency of this action.

90.     First Montauk also seeks an injunction requiring the Okun Defendants, including, in particular, Mr. Okun and IPofA, to provide to the NASD the financial information requested of them by the NASD in connection with FMSC's Rule 1017 Application to the NASD approving a change of control of FMSC.

91.     First Montauk has no adequate remedy at law for Buyer's repudiation and material breach of the Merger Agreement and the imposition of an injunction to preserve the status quo pending the determination of First Montauk's claims is the only remedy by which the harm to First Montauk and its shareholders (other than Ownership) may be fully redressed.

WHEREFORE, First Montauk respectfully demands that the Court enjoin Mr. Okun and Ownership, during the pendency of this action, directly, indirectly or through third parties, without the prior written consent of First Montauk or an order of this Court, from

selling or otherwise disposing of any First Montauk securities that he and/or Ownership

currently beneficially own, from purchasing or otherwise acquiring any additional First

Montauk securities and from converting shares of First Montauk Series A Preferred Stock into

shares of First Montauk Common Stock in order to preserve the <u>status quo</u> during the

pendancy of this action, so that First Montauk's request for specific performance of the Merger

Agreement will not be rendered moot or impossible  by the Okun Defendants; awarding to

First Montauk its cost and disbursements, including attorneys' fees, and such other and further

relief as the Court deems just and proper.

<u>Third Cause of Action</u>
<u>(Against Buyer for Breach of Contract)</u>

92.     First Montauk repeats and realleges paragraphs 1 through 91 of this

complaint as if fully set forth herein.

93.     First Montauk asserts this cause of action in the alternative in the event that

the Court fails or declines to order specific performance of the Merger Agreement or in the event

that the NASD refuses to grant FMSC's Rule 1017 Application by reason of the Okun

Defendants' refusal to provide requested financial information.

94.     By reason of its execution of the Merger Agreement, Buyer and First

Montauk have contractual obligations to each other.

95.     By reason of Buyer's conduct as set forth above, Buyer has breached its

contract with First Montauk, by among other things, refusing to consummate the merger in

accordance with the Merger Agreement.

96.      As a direct and proximate result of Buyer's breach of contract, First

Montauk has suffered compensatory damages in an amount to be determined by the Court.

WHEREFORE, First Montauk respectfully demands judgment against Buyer, jointly and severally, for compensatory damages in an amount to be determined by the Court; awarding to First Montauk its cost and disbursements, including attorneys' fees, and such other and further relief as the Court deems just and proper.

**Fourth Cause of Action**
**(Against Buyer for Breach of the Covenant of Good Faith and Fair Dealing)**

97.      First Montauk repeats and realleges paragraphs 1 through 96 of this complaint as if fully set forth herein.

98.      First Montauk asserts this cause of action in the alternative in the event that the Court fails or declines to order specific performance of the Merger Agreement or in the event that the NASD refuses to grant FMSC's Rule 1017 Application by reason of the Okun Defendants' refusal to provide requested financial information.

99.      By reason of its execution of the Merger Agreement, Buyer has obligations of good faith and fair dealing with respect to First Montauk.

100.     By reason of Buyer's conduct as set forth above, Buyer has breached its obligations of good faith and fair dealing.

101.      As a direct and proximate result of Buyer's breach of its obligations of good faith and fair dealing, First Montauk has suffered compensatory damages in an amount to be determined by the Court.

WHEREFORE, First Montauk respectfully demand judgment against Buyer, jointly and severally, for compensatory damages in an amount to be determined by the Court; awarding to First Montauk its cost and disbursements, including attorneys' fees, and such other and further relief as the Court deems just and proper.

## Fifth Cause of Action
### (Against Buyer for a Declaratory Judgment)

102.     First Montauk repeats and realleges paragraphs 1 through 101 of this complaint as if fully set forth herein.

103.     As alleged above, under the terms of the Merger Agreement and Escrow Agreement, in the event that the merger did not close on or before the agreed expiration date through no fault of First Montauk, or did not close because Ownership had materially breached any of its representations, warranties, covenants or agreements, which breach had not been cured or was incapable of being cured, First Montauk would be entitled to receive the $2,000,000 from the Escrow Agent.

104.     In the event that the merger does not close, the merger will not have closed through no fault of First Montauk, or did not close because Ownership had materially breached any of its representations, warranties, covenants or agreements, which breach had not been cured or was incapable of being cured.

105.     There exists a real, actual and present controversy with respect to whether the merger will not have closed through no fault of First Montauk, or did not close because Ownership had materially breached any of its representations, warranties, covenants or agreements, which breach had not been cured or was incapable of being cured, which is within the power of this Court to determine pursuant to the Rules of Court.

106.     First Montauk seeks a declaration from this Court that it did not breach the Merger Agreement and that the merger will not have closed through no fault of First Montauk, or did not close because Ownership had materially breached any of its representations, warranties, covenants or agreements, which breach had not been cured or was incapable of being cured and

that it is accordingly it is entitled to receive the $2,000,000 deposit being held in escrow by the Escrow Agent.

WHEREFORE, First Montauk respectfully demands judgment against Buyer, jointly and severally, for a declaration that First Montauk is entitled to receive the $2,000,000 deposit being held in escrow by the Escrow Agent; awarding to First Montauk its cost and disbursements, including attorneys' fees, and such other and further relief as the Court deems just and proper.

Sixth Cause of Action
(Against Water View for a Declaratory Judgment)

107.    First Montauk repeats and realleges paragraphs 1 through 106 of this complaint as if fully set forth herein.

108.    As alleged above, in the event that the Court does not order specific performance of the Merger Agreement, First Montauk seeks a declaratory judgment to rescind the Lease with Water View, an affiliate of Mr. Okun, for the Premises, on the ground that the Okun Defendants fraudulently induced First Montauk to execute the Lease, falsely representing that Buyer would proceed to consummate the Merger Agreement failing which First Montauk would not be required to occupy the Premises or pay any rent to Water View under the Lease.

109.    As alleged above, Mr. Okun, on behalf of the Okun Defendants, fraudulently induced First Montauk to execute the Lease without a provision making it conditional upon the consummation of the Merger Agreement to facilitate the financing of the Premises, which he represented were to be purchased by an affiliate of IPofA and pledged as collateral for a loan the proceeds of which would, among other things, be used to contribute capital to First Montauk pursuant to the terms of the Merger Agreement.

110.    The representations made by Mr. Okun on behalf of Water View and the other Okun Defendants were false at the time,  and Mr. Okun made them with knowledge of their falsity and with the intention that First Montauk would reasonably rely upon them in executing the Lease to its detriment.

111.    But for First Montauk's reasonable reliance on the truth of the representations made by Mr. Okun, then individually and through Ownership, a major shareholder of First Montauk, that Buyer would proceed to consummate the Merger Agreement failing which First Montauk would not be required to occupy the Premises or pay any rent to Water View under the Lease, First Montauk would not have executed the Lease.

112.    There exists a real, actual and present controversy with respect to whether Mr. Okun fraudulently induced First Montauk to execute the Lease, which is within the power of this Court to determine pursuant to the Rules of Court.

113.    First Montauk seeks a declaration from this Court that it was fraudulently induced to execute the Lease and the accordingly, the Lease should be rescinded.

WHEREFORE, First Montauk respectfully demand judgment against Water View for a declaration that First Montauk was fraudulently induced to execute the Lease and that the Lease is rescinded; awarding to First Montauk its cost and disbursements, including attorneys' fees, and such other and further relief as the Court deems just and proper.

Dated:  January 8, 2007

ROTTENBERG LIPMAN RICH, P.C.

By: _____
        Mark M. Rottenberg

JURY TRIAL DEMANDED

First Montauks demand a jury trial on all issues so triable.

CERTIFICATION PURSUANT TO R.4:5-1

The undersigned hereby certifies, upon information and belief, that the matter in controversy is not subject to another action pending in any court or arbitration proceeding and that there is no other action or arbitration proceeding contemplated and there are no parties who should be joined in this action other than those joined herein, except that Signature Bank, a New York State chartered bank, acting as escrow agent pursuant to the terms of the Escrow Agreement discussed above, has an interest in this matter, but is not named herein as it appears that it may not be subject to this Court's personal jurisdiction.

DESIGNATION OF TRIAL COUNSEL

First Montauk designates Mark M. Rottenberg, Esq. of Rottenberg Lipman Rich, P.C. as trial counsel.

Dated:  January 8, 2007

ROTTENBERG LIPMAN RICH, P.C.

By: _____
       Mark M. Rottenberg